**FORD MOTOR COMPANY, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**
**C.D. 4380; Protest Nos. 67/71144–8549, etc.**

United States Customs Court,
Second Division.
Sept. 28, 1972.

Before RAO, FORD and NEWMAN, Judges.

NEWMAN, Judge:

These twenty-four consolidated protests involve the proper tariff classification for the following merchandise imported from Belgium and England during the years 1966 through 1969:

Cabs for harvesting combines
Oil reservoirs for power steering assemblies
Toolboxes

The above-enumerated articles were assessed with duty at the rate of 19 per centum ad valorem under the provision in item 657.20 of the Tariff Schedules of the United States (TSUS) for articles of iron or steel, not coated or plated with precious metal.

Plaintiff claims that the combine cabs are classifiable as "parts" of "harvesting and threshing machinery", which are admitted free of duty under item 666.00, TSUS. The power steering reservoirs and toolboxes are claimed by plaintiff to be classifiable as "parts" of "tractors suitable for agricultural use", which are also admitted free of duty pursuant to item 692.30, TSUS.

We sustain the protests.[1]

At the trial, plaintiff called six witnesses and introduced sixteen exhibits in evidence, two jointly with defendant. Defendant presented no evidence other than the two joint exhibits. The record establishes:

The imported cabs are three-sided objects made largely of tinted glass. They are designed to be attached to the operator's platform of plaintiff's harvesting combines, with a grain tank on the combine serving as a fourth side to form a complete enclosure around the operator. It appears that the purpose of the cab is to protect the combine operator from dust, dirt, chaff or other debris thrown into the air during the harvesting of a crop, which may be irritating or hazard-

O'Boyle, Stock & Larrouy, San Francisco, Cal. (David R. Larrouy, San Francisco, Cal., of counsel), for plaintiff.

Harlington Wood, Jr., Asst. Atty. Gen. (James Caffentzis, Bernard J. Babb and Joseph I. Liebman, New York City, trial attys.), for defendant.

1. Protest 69/3913 is untimely insofar as it covers entry 60783, and accordingly is dismissed respecting that entry.

ous to the operator's eyes, nose and lungs. It also appears that without the cab the dust created by harvesting could obstruct the operator's view of chuck-holes, large rocks or logs in the field which might damage the combine. Further, the cabs provide protection to the operator from the weather.

The cabs are equipped with: windshield wipers which keep the glass free of dust to maintain visibility; a pressurized fan system at the top which draws air from outside the cab and blows it down on the operator; a dome light; and a floor mat and seals to keep dust and dirt from entering the bottom of the cab.

Although cabs *per se* are used on different types of vehicles, the imports are dedicated to use solely on Ford's harvesting combines [2] and have no other use. However, the use of the cab on Ford's combines is optional, and combines have been operated without cabs. In 1967 (the year of importation) the installation rate of cabs on Ford's combines for the entire United States was 71 percent.

Plaintiff's exhibit 10 is a Ford assembly manual, which (pages 40–44) explains the procedure for installation of a cab on a combine. Briefly, installation of the cab requires removing a rail from the platform; sealing various openings or holes in the platform; installing a sealing mat on the floor of the platform; drilling holes both in the combine platform and in the grain tank for bolt connections; lifting the cab onto the platform of the combine with a hoist or crane; bolting the cab into position; and making the necessary electrical and wiring connections to the cab's dome light, windshield wipers and fan system. Once the cab has been installed, removing it would take the time of three men approximately two hours, and would require breaking the electrical connections, removing the bolts holding the cab to the platform and grain tank, hoisting

the cab down, and replacing the rail on the platform that was initially removed to install the cab.

With respect to the oil reservoirs, the record establishes without contradiction that they are an essential part of the power steering system in certain models of Ford agricultural tractors; that the reservoirs are dedicated solely to such use; and that the power steering system contributes to the safe and efficient operation of the tractors. In the heavier tractors, power steering is virtually a necessity; while in the lighter models, power steering performs a safety function in that it eliminates the tendency of the steering wheel to "kick or spin" when the tractor hits an obstruction in the field.

The imported "toolboxes" were installed as standard equipment on certain models of Ford agricultural tractors. Description of the articles as "toolboxes" is a misnomer, inasmuch as they are normally not used for carrying tools. Rather, the boxes are used for carrying such items as sheer pins, lynchpins, drawbar pins, adaptors and other items frequently used when the tractor is being operated.

The boxes are designed to be bolted into an indentation or impression on the left fender of the tractor. There are three holes in the fender which "match up" with three embossed portions on the back of the box for the bolts. The toolbox "serves a very useful purpose because it permits the operator to carry these pins, adaptors, or other items that he might need while attaching equipment or while performing some job" (R. 215).

■ Based upon the foregoing factual background, plaintiff argues that the imports are "parts", while defendant insists they are "accessories". However, the power steering reservoirs are now acknowledged by defendant in its brief to be parts of tractors suitable for agri-

---

**2.** The parties stipulated that Ford harvesting combines are machines for threshing and harvesting (R. 9).

cultural use, and the record so establishes. Accordingly, we hold that the power steering reservoirs are entitled to entry free of duty pursuant to item 692.30, TSUS. The issue, then, is narrowed to the classification of the cabs for harvesting combines and the toolboxes for tractors.

The Appellate Court has stated in a leading decision: "[W]hether a given article constitutes a part of another article depends upon the nature of the so-called part and * * * to some degree on the function and purpose of the so-called part in its relation to the article to which it attaches or with which it is designed to serve". Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849 (1964). That case involved auxiliary heaters which were optional equipment for Volkswagen automobiles equipped at the factory with a conventional heater as standard equipment. In holding that the auxiliary heaters were parts of automobiles (reversing the decision of the Customs Court), the Appellate Court observed (52 CCPA at 16):

Here, as in *Pompeo* [43 CCPA 9, C.A.D. 602 (1955)], the imported articles are dedicated to a sole specific use and "for no other use." Here, as in *Trans Atlantic Company* [48 CCPA 30, C.A.D. 758 (1960)], the imported article serves a useful function. In *Trans Atlantic* the brackets mounted on the door frame were necessary to the efficient operation of the door closer. Here the record supports the view that the auxiliary heater contributed to the safe and efficient operation of the Volkswagen in frigid temperatures in relation to the comfort of its occupants and in aid of the indispensable safety factor of vision by assisting in the removal of ice from the windshield.

The facts of record that the auxiliary heater was optional equipment; that the Volkswagen came equipped with a conventional heater and that the automobile could be operated without the additional heater, are not of such vital import as to be determinative of the issue. When once attached to the automobile to which it was solely dedicated and in the manner disclosed, and in the performance of the function for which it was designed, it became a part of the automobile within the purview of paragraph 369(c) of the Tariff Act of 1930, as modified.

■■ The cabs in this case are dedicated to a sole and exclusive use—harvesting combines; they serve a useful function, and contribute to the safe and efficient operation of the harvesting combines. As noted, the cabs protect the combine operator from dust, dirt, chaff or other debris thrown into the air during the harvesting of a crop, which could be irritating or hazardous to the operator's eyes, nose and lungs. Furthermore, the cabs aid in the indispensable safety factor of vision by preventing dust created by the harvesting operation from obstructing the operator's view. The fact that the cabs were optional equipment at the time of importation and the fact that the combines could be operated without cabs are clearly not determinative of whether they are "parts" or "accessories" for tariff purposes. To paraphrase a portion of the above quotation from *Gallagher & Ascher* (52 CCPA at 16), when once attached to the combine to which it (the cab) was solely dedicated and in the manner disclosed, and in the performance of the function for which it was designed, the cab became part of the combine. Hence, the cabs are entitled to entry free of duty as parts of harvesting and threshing machinery under item 666.00, TSUS.

■ We turn now to the so-called toolboxes. They were dedicated for use *as standard equipment* on certain models of Ford's agricultural tractors. The boxes contributed to the efficient use of the tractors by providing a place to carry various articles including pins and adaptors for attaching implements to the tractors. Under these circumstances, we

find that the toolboxes are parts, rather than mere accessories. Consequently, the toolboxes are entitled to free entry pursuant to item 692.30, TSUS, as parts of tractors suitable for agricultural use.

Finally, we have noted that in support of its position herein, defendant relies heavily upon Herbert G. Schwarz, dba Ski Imports v. United States, 417 F.2d 1391, 57 CCPA 19, C.A.D. 971 (1969). Inasmuch as that case involved substantially different merchandise (luggage and ski racks for automobiles); and because of the special statutory history of the provision involved therein, we do not feel that *Schwarz* is apposite to the present case. Cf. Victoria Distributors, Inc. v. United States, 425 F.2d 759, 57 CCPA 76, C.A.D. 979 (1970).

The protests are sustained, and judgment will be entered accordingly.

RAO and FORD, JJ., concur.